## Kirby *v.* Thames & Mersey Ins. Co., Limited.

*(District Court, E. D. Wisconsin.    April, 1886.)*

1. **Marine Insurance—Insurer's Liability to Uninsured Part Owner for Negligence.**
    Where an insurer has insured the interest of a half owner of a vessel; and the vessel was stranded during a voyage; and such half owner requests the insurer to render her assistance; and the insurer sends an agent to the vessel with instructions "to render such assistance as is necessary;" and such half owner notifies the insurer that he abandons his interest in the vessel to the insurer; and such agent, with the aid of the master, crew, and such half owner, move the disabled vessel to a harbor; and afterwards, without further orders from the insurer, such agent, the master, and crew, with the aid of such part owner, attempt to navigate the vessel to her home port, which is also her port of destination; and during the voyage the vessel is lost: *held*, that the insurer is not liable to the owner of the uninsured half interest in the vessel for her loss, and is not, as to him, chargeable with negligence.

2. **Same—Right of Part Owner to Abandon under Insurance Policy.**
    Where a policy of insurance on the interest of a part owner of a vessel pro-

---

[1] Reported by Russell H. Curtis, Esq., of the Chicago bar.

vides that the insured shall not have a right to abandon unless the amount, which the insurer would be liable to pay under an adjustment as of a partial loss, would exceed half the amount insured, nor unless the insurer would receive a perfect title to the subject abandoned, *intimated,* that a notice of abandonment by the insured to the insurer, before the facts which affect the right to abandonment are ascertained, does not constitute an abandonment under the policy.

3. SAME—ABANDONMENT BY PART OWNER DOES NOT AFFECT CO-OWNERS—MASTER'S DUTY.

Abandonment by one part owner of a stranded vessel of his interest in the vessel to the insurer of such interest does not affect the interest of other part owners, nor the master's control over the vessel, so far as their interest is concerned.

4. SAME—AGENCY—EXTENT OF WRECKING MASTER'S AUTHORITY FROM INSURER.

Authority by an insurer to a wrecking master to render "necessary assistance" to a stranded vessel does not confer on such agent any authority to accept an abandonment of a part owner's interest, nor authority to navigate the disabled vessel to her home port after having once moved her into a harbor.

5. SAME—WEIGHT OF EVIDENCE ESSENTIAL TO RECOVERY.

Libelant must, to recover, clearly prove his case.

*Markham & Noyes,* for libelant.
*Van Dyke & Van Dyke,* for respondent.

DYER, J. The libelant, Kirby, and one Ebert, were owners of the schooner Arab, a vessel engaged in lake navigation, each owning an undivided one-half interest. Ebert was managing owner, and his interest was insured in the sum of $2,000, under a policy issued by the respondent company. The libelant's interest was uninsured. About the first November, 1883, the vessel was stranded near the harbor of St. Joseph, Michigan. The master, Capt. Charles Starke, immediately telegraphed to Fitzgerald & Co., the local agents of the insurance company, at Milwaukee, that the vessel was ashore, and requesting assistance. Fitzgerald & Co. at once telegraphed Crosby & Dimick, general agents of the company at Buffalo, saying that help could not be sent from Milwaukee, and that it could be better obtained in Chicago. Crosby & Dimick then forwarded a dispatch to the agents of the company in Chicago to send Martin Blackburn to the vessel, "to render such assistance as was necessary." Blackburn was immediately engaged, and proceeded to St. Joseph. He procured a tug and pumps. Part of the cargo was removed from the vessel, and placed on the pier, and within a few days she was got off, and was taken into the port of St. Joseph. Ebert and the master and crew of the vessel took part in the wrecking operations. On the sixth of November, and before the vessel was got off the beach, Ebert sent a telegram to the Buffalo agent, stating that he abandoned his interest in the vessel to the insurance company. This telegram was written by Blackburn for Ebert. On the same day Ebert sent a similar telegram to Fitzgerald & Co., the local agents at Milwaukee. The proofs show that the Buffalo agents never received the telegraphic notice of abandonment alleged to have been sent to them by Ebert; but Fitzgerald & Co., on the receipt by them of notice of abandon-

ment, forwarded it by mail to the Buffalo agents, who received it some time after the 6th. The schooner was taken into the harbor at St. Joseph, probably on the 9th. Sails were put under her to stop her leaks and keep her afloat, and some portion of that part of the cargo which had been previously taken off was placed again on board. Ebert and the master and crew took part more or less in this work. Milwaukee was the home port of the vessel, and was the port of destination of both vessel and cargo when she was driven ashore. On the evening of the 10th the tug, with Capt. Blackburn on board, took the vessel in tow, accompanied by her master and crew and a sufficient force to keep the pumps in operation, and set out for Milwaukee. The voyage was prosecuted successfully until about 4 o'clock the following morning, when the vessel became suddenly water-logged, and was lost. This suit is now brought by the libelant, Kirby, to recover from the insurance company the value of his one-half interest in the vessel, on the ground that in these transactions Capt. Blackburn was the representative and agent of the company, exercising control over the vessel; that he was guilty of gross negligence in attempting to take her across the lake when she was in an unseaworthy condition, and that in consequence of such negligence she was lost.

I cannot doubt that Capt. Blackburn, in his operations for the relief of the vessel, and down to the time when she was taken into the port of St. Joseph, was acting as the representative of the insurance company. This appears outside of testimony which was objected to, such as his own statements on the subject, which I rule incompetent. He went to the scene of the wreck at the instance of the general agents of the company who designated him specially for the employment, and he was accordingly employed by the local agents in Chicago to render such assistance to the vessel as was necessary. The insurance company was interested in the rescue of the vessel, because it had issued a policy covering Ebert's interest; and all parties seem to have co-operated in the service, for the purpose of protecting from loss the interests of the respective parties, including that of the libelant, Kirby.

It seems to me, also, that after Crosby & Dimick received from Fitzgerald & Co. the notice of abandonment sent in the form of a telegram by Ebert, on November 6th, the insurance company might very properly, so far as Ebert's interest was concerned, assert the right to look after and protect that interest. Whether it was a technical abandonment, under an absolute right to abandon, is doubtful. The policy provided that the insured should not have a right to abandon, unless the amount which the insurer would be liable to pay under an adjustment as of a partial loss should exceed half the amount insured; nor was any abandonment to be valid unless it should be efficient to convey to, and vest in the insurance company an unincumbered and perfect title to the subject abandoned; and the

facts bearing upon these conditions in the policy, and which affected the right to abandon, were not then ascertained.

I regard it extremely doubtful whether, under any authority Blackburn had from the insurance company, he could act for the company so as to make it liable for the consequences of his negligence, after the vessel was brought into the port of St. Joseph. He was a wrecking master. His instructions were simply to go to the assistance of the vessel; and when he got her off the beach, and safely into port, it would seem that his authority ceased, and that, without further authority, what he might thereafter do, especially if he proposed to take the vessel, in a disabled condition across the lake, would be done upon his own responsibility, so far as the company was concerned. In a case like this, where it is sought to charge one party with damages resulting from the negligence of another, it ought clearly to appear that the act out of which the alleged liability springs was within the scope of the latter's authorized employment. The company does not appear to have given Blackburn any authority to take possession of the vessel, or to do anything with her except to assist in relieving her from the immediate extremity she was in. He had no authority to accept an abandonment. He received no instructions from the company to take her out of St. Joseph harbor, or to take her to any other port for repairs. If the determination of the case turned upon this question, I should be strongly disposed to hold that after the wrecking service was completed, and the vessel brought into port, Blackburn's relation to the company, as its representative, ceased, and that in what was subsequently done he acted on his own responsibility, and rather in the capacity of an independent salvor than as the agent of the company.

Even if Blackburn were to be regarded as the company's agent, acting within the scope of his employment, down to the time the vessel was lost, it is not altogether clear that such negligence was imputable to him in attempting to take the vessel to her port of destination as would make the company liable for her loss. If he acted in good faith, but erred in his judgment as to the success of the undertaking, it might not follow that such error of judgment alone should involve his principal in a liability to damages, the same as if the loss had been occasioned by positive negligence. The law does not judge the facts in such a case with all the wisdom that comes after the event, but rather in the light of the circumstances and situation as they appeared at the time to those charged with negligence. However this may all be, upon an attentive perusal of the testimony, and upon consideration of all the circumstances of the case as I am enabled to judge of them in the light of the evidence, I am well convinced that the attempt to take the vessel to the port of Milwaukee was made, not alone upon the individual responsibility of Capt. Blackburn, but with the consent and acquiescence, and in accordance with the expecta-

tion, of both Ebert and the master of the vessel. Although both of these parties seek to place the entire responsibility of the attempted voyage across the lake upon Blackburn, it is quite evident that they co-operated in the preparations for that voyage, and the circumstances strongly point to the conclusion that they expected and desired the vessel to be taken to the port of Milwaukee, which, as before observed, was the port of destination of both vessel and cargo. To my mind, in view of all the circumstances, it is hardly credible that Blackburn, *without any interest so to do,* would, of his own independent will, take the vessel across the lake. He had no instructions from the insurance company which authorized it. No fact is disclosed which would naturally prompt him to do it, in the absence of a desire and expectation on the part of the master of the vessel that it should be done.

The alleged abandonment did not transfer the managing ownership to the insurance company. If there was a valid abandonment, it was only of Ebert's interest. The other half interest owned by the libelant was unaffected by the abandonment, and the surrender by Ebert to the company of his interest did not determine the master's duty or authority, so far as the libelant's interest was concerned. He still owed allegiance to the vessel, as the representative of the libelant's interest in the existing emergency. His authority had not been countermanded or withdrawn by the libelant, who knew the vessel was in distress. The duty of the master, and his right to a voice in the control of the vessel in behalf of the libelant's interest, after she was got into port at St. Joseph, still remained; and, so far as anything is here disclosed, he could not be legally dispossessed of that right by Blackburn; nor could Ebert, by any directions to the master after the alleged abandonment, legally authorize or instruct him to abdicate his functions as master in favor of Blackburn, so far as the libelant's interest was concerned.

As I have said, the circumstances tend strongly to prove the concurrence of the master in the proposal to take the vessel to Milwaukee. It was for his interest and the interest of the party he represented, that this should be done. He says everything was done under the directions of Blackburn and that the vessel was not fit to cross the lake, and yet he made not the slightest objection to the voyage. He undoubtedly expected that the vessel would be taken to her home port; and, indeed, he says in his testimony that when they were sheathing her with the sail, and putting part of her deck load again on board, he knew she was going across the lake. His statement, in another connection, is: "I knew she was not going to stay there, because she could not be rebuilt there; or perhaps she could, but it cost a good deal more." When asked when he first learned the vessel was to be taken out of St. Joseph, he seems to repeatedly evade the question, and says he was at supper when he first learned "the particular place to which she was bound." Finally he says:

v.27 F.no.2—15

"I always had an idea she would be taken to Milwaukee," and that he understood that when she was got off the beach she was to be taken there. He and the crew assisted in the work done preparatory to the voyage, and it is not reasonable to suppose, if he thought the vessel "was not fit to cross the lake," that he, with his entire crew, would have gone aboard, without objection, to make the voyage. In his examination these questions are asked, and answers given:

"*Question.* You didn't know anything about it, then, [referring to the proposed voyage across the lake] when you put the light lumber in her during that afternoon? *Answer.* Well, I knew that they would not rebuild her in St. Joseph; but I didn't know exactly where she was going, because I didn't ask. *Q.* Then, you knew all the time that she was not to be repaired at St. Joe; but was to be taken across the lake to be repaired? Was that it? *A.* Well, I thought she would have some repairs, but I knew she was not going to be rebuilt there."

That the master deferred to Blackburn's judgment is highly probable, but that he surrendered his position as master, and also the uninsured interest of the libelant in the vessel, seems to me very improbable. On the contrary, various out-croppings in the testimony, and the circumstances of the affair, lead me to think that he concurred and assisted, not alone in the efforts made to release the vessel from her extremity, but in all the preparations to take her across the lake, without objection or dissent, and that he so acquiesced, in the belief and with the understanding, that he was thereby promoting the interest of the libelant, whom he still represented.

It also appears that Ebert was more or less active in the preparations which preceded the attempt to cross the lake. He placed the sail under the vessel, put the hoistings inside the canvas, remained with or near the vessel while the work was in progress, and saw her leave St. Joseph without dissent or objection. He claims that before rendering assistance he asked Blackburn if he should do so, which, under the circumstances, seems very improbable. He says that the day Blackburn came to the relief of the vessel he told him to take her to Milwaukee, and that he thought if they could get her right off "it would not hurt to take her." The cargo belonged to his father-in-law, was consigned to Milwaukee, and he made no objection to so much of it as was carried remaining on board. The testimony also shows that he expended money to pay wages of seamen earned, and bills incurred after the abandonment of his interest, and I cannot resist the conclusion that all the parties contributed their best endeavors—*First*, to get the vessel out of her extremity, and *then*, to take her, with part of her cargo, to Milwaukee, her port of destination. If an error of judgment was committed, it was a mutual error. If there was negligence, it was negligence in which all shared. The master was the legal representative of the uninsured interest, participating in and consenting to the venture; and so I am of the opinion that the loss which resulted ought not to be visited upon the respondent, especially when the authority of Blackburn to employ the

vessel in navigation, even for the purpose of taking her to her home port, is not clear.

The testimony of Blackburn is in direct antagonism to that of Ebert and Capt. Starke, and although various particulars in which he is corroborated by the circumstances might be pointed out, I do not deem it necessary to extend discussion of the subject. At best, the right which the libelant asserts against the respondent is doubtful. A clear case of liability is not, in my opinion, established, and the libel must therefore be dismissed.